Filed 7/26/16  In re A.M. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re A. M., a Person Coming Under the Juvenile Court Law. | D069625 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. CJ1180) |
| v. | |
| C. M., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Randall White, Judge.  Affirmed.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Kristen M. Ojeil, Deputy County Counsel, for Plaintiff and Respondent.

San Diego County Health and Human Services Agency (Agency) filed a petition in juvenile court after the newborn child (A.M., hereafter Baby) of C.M. (Mother) tested positive for narcotics at birth, and Baby became a dependent of the juvenile court. The court ordered services for Mother to address the protective issues, but she did not reunify with Baby because she did not make substantive progress in the treatment plan to address her drug addiction. Consequently, the court terminated services to Mother and set a Welfare and Institution Code section 366.261[1] hearing to terminate parental rights.

Subsequently, Mother filed a section 388 petition seeking placement of Baby and reinstatement of reunification services. At the combined section 388 and section 366.26 contested hearing the juvenile court denied Mother's section 388 petition, determined Baby would likely be adopted and that adoption would be in her best interests. The court terminated parental rights and ordered a permanent plan of adoption for Baby. Mother timely appealed, and contends the juvenile court erred by (1) denying her section 388 petition; and (2) terminating her parental rights.

FACTUAL AND PROCEDURAL HISTORY

A. The Detention and Jurisdiction/Disposition

Baby was born in July 2014, with methamphetamine in her system, caused by Mother's drug use while pregnant. Five days later, Agency filed a petition under section 300, subdivision (b)(1), because of Mother's inability to protect and provide adequate care for Baby because of Mother's and Baby's positive tests for methamphetamine at the

---

1    All statutory references are to the Welfare and Institutions Code.

time of Baby's birth, and Mother's history of drug use.  Mother admitted using drugs when she was stressed, that her drugs of choice are cocaine and marijuana, and that she uses cocaine when it is available.  During her pregnancy, she tested positive for marijuana and benzodiazepine and admitted to ingesting what she believed was cocaine the day prior to Baby's birth.

At the detention hearing, the juvenile court made a prima facie finding on the petition, detained Baby in out-of-home care, and ordered liberal supervised visitation and voluntary services to Mother.  At the contested jurisdiction and disposition hearing on July 31 the court read and considered the social worker's jurisdiction/disposition report dated July 31 that outlined Mother's admissions to using marijuana, cocaine, and methamphetamine.  In addition, she reported being under stress because of mental health issues of depression and housing difficulties; and expressed a willingness to participate in services.  The juvenile court made a true finding on the petition by clear and convincing evidence; declared Baby a dependent; ordered that she be placed with a nonrelative extended family member (NREFM) as Baby's caregiver (Ms. K. L., hereafter caregiver); and ordered reunification services to Mother.  Mother's case plan included counseling and mental health services, parenting education, substance abuse services, and liberal visitation.

B. The Reunification Period

As of the six-month review hearing on February 19, 2015, Mother was enrolled in Kiva, an inpatient substance abuse treatment program, to address her substance abuse and housing issues. The social worker noted that although Mother visited regularly and there

3

appeared to be a strong parent-child bond, it would be detrimental to return Baby to Mother's care based on Mother's pattern of relapse on alcohol and drugs, including methamphetamine. Mother also struggled with lack of stable housing, and was in need of therapeutic treatment. The juvenile court found returning Baby to Mother would create a substantial risk of detriment to Baby, but ordered additional reunification services for Mother.

As of the contested 12-month review hearing, the reports documented concerns over Mother's unstable housing situation, her relapse (just two weeks prior to the review hearing) to using drugs, and her failure to address her substance abuse problem at the inpatient treatment program. Mother did visit Baby regularly and the social worker noted that they appeared bonded. The court considered the Agency's status review report dated July 22, 2015, and addendum dated August 6, 2015, a July 22, 2015, report from a court appointed special advocate (CASA), and Mother's testimony that included a statement that she was participating in the court-ordered services just to get her "baby back, and that's it."

The juvenile court found Mother had not made substantive progress with the provisions of her case plan, return of Baby to Mother would create a substantial risk of detriment to Baby, and there was no substantial probability she would be returned to Mother within the next five months. The court terminated Mother's reunification services, set a section 366.26 hearing, and ordered continued liberal, supervised visitation.

4

C. The Section 366.26 Assessment

On November 17, 2016, the Agency filed a section 366.26 report and subsequent addendum for the section 366.26 hearing recommending that Mother's parental rights be terminated and a permanent plan of adoption be ordered. The social worker noted that during the reunification period Mother visited Baby regularly but did not fulfill a parental role in her life.

Similarly, between the time services were terminated and the original section 366.26 hearing, Mother had supervised visits with Baby at the caregiver's home. The social worker noted that although Mother attended all visits and was prepared for each visit, she was not able to meet Baby's needs during the visit or manage the care of both of her children during a structured 60-90 minute visit.[2] The social worker noted that it appeared Mother lacked a significant parent-child relationship with Baby, who identified the caregiver as her primary caregiver, and testified Baby identified Mother more as a relative or close friend than a birth parent.[3]

---

[2] For example, at a visit on October 17, Mother showed up with the child's newborn half-sibling but had to ask the caregiver for help while Mother held the sibling or pumped milk. During another visit on October 31, Mother tried to put a Halloween mask on Baby and comb her hair, but became frustrated when Baby would not let her do so, and Mother then asked for help from the caregiver's relative, who completed the task.

[3] For example, during the October 17 visit, Baby looked to the caregiver when she had a soiled diaper, sought approval from her by making eye contact, went to her for water, and ran to the caregiver for comfort when she was scared by a loud sound even though Mother was in closer proximity. Although Mother displayed affection toward Baby with a hug and kiss, Baby accepted the affection but did not reciprocate it, and the caregiver reported Baby does not cry or appear distressed when Mother departs the visits. During visits in December, Baby looked to the caregiver for approval several times

5

The adoptions placement coordinator assessed Baby as generally adoptable, with 34 possible adoptive families in San Diego County willing to adopt a child with her characteristics as of November 12, 2015. Additionally, Baby was assessed as specifically adoptable because her caregiver was willing to adopt her. Based on the Agency's assessment, Baby established an attachment to her caregiver, as evidenced by Baby seeking her for affection, approval, security, comfort, and to meet her daily needs. These behaviors identified the caregiver as Baby's primary caregiver, who met all of her daily needs and was committed to providing her with safety, well-being, and permanence. The caregiver had a family support system in place to help care for Baby if needed, and the caregiver was open to continued visits with Mother so long as they were beneficial and appropriate.

The social worker testified, based on her observations, Mother was unable to meet Baby's needs during the supervised visits and could not manage caring for her and her half-sibling. More importantly, the Agency concluded that it appeared Mother "lack[ed] a significant parent-child relationship with [Baby]," and did not have a parental role in Baby's life. During the reunification period, Mother did not progress to unsupervised visits and Baby did not seemed distressed when visits ended. Baby identified her caregiver as her primary caregiver, looked to her for approval when exploring unfamiliar areas or persons, and was distressed when she was taken from the caregiver's home. The social worker observed that Baby's relationship with Mother was akin to a relative rather

_____

before doing something, called the caregiver "[m]ommy," and separated from Mother at the end of the visits without distress.

6

than a birth parent, as evidenced by her absence of distress when separating from Mother and not looking to her for approval or affection. Finally, the social worker noted it appeared Baby did not have a significant attachment to her half-sibling, born in September 2015, because they did not have any shared experiences and they had never lived together. Thus, there was no detriment to Baby if parental rights were terminated, and a permanent plan of adoption was in her best interests.[4]

D. <u>Mother's Section 388 Petition</u>

Mother filed a section 388 petition on December 28, 2015, seeking placement of Baby with her or, in the alternative, that reunification services be reinstated for Mother up to the 24-month review date. The petition included attachments verifying Mother's enrollment and phase one status in Dependency Drug Court, enrollment verification at Kiva since August 7, 2015, with results of onsite random drug testing, and a letter from Kiva verifying Mother volunteered there as a daycare coordinator responsible for scheduling and organizing the Kiva daycare facility. At a January 4, 2016, hearing, the juvenile court found Mother had made a prima facie case by making a "minimal showing" of both changed circumstances and best interests of the minor, and therefore set a section 388 evidentiary hearing.

---

[4] The CASA provided the juvenile court two informational reports, dated December 1, 2015, but did not make any formal recommendations based on her limited ability to gather information during this period. The CASA noted Mother maintained regular visitation with Baby and that it appeared Mother and Baby had a strong connection, based on previous visits she had observed and one visit she observed on November 21, 2015.

E. The Combined Section 366.26 and Section 388 Hearing

At the combined section 366.26 and section 388 hearing on January 15, 2016, the juvenile court admitted into evidence numerous reports, and also heard testimony by Mother, the caregiver, and the social worker.

The caregiver testified she has cared for Baby since she was 10 days old, supervising visits with Mother during that time. She testified that Mother would play with Baby and care for both Baby and her sibling during visits. Further, the caregiver testified she was willing to adopt Baby if parental rights were terminated.

Mother testified she is an addict, and that she entered her current residential treatment program at Kiva on August 7, 2015, which she completed on December 27, 2015, and during which she had numerous clean drug tests. She was currently looking for housing, was on the third step of the 12-step program, and had obtained a sponsor the previous October. However, she admitted she had previously completed Kiva's residential treatment program on April 1, 2015, during which she had participated in drug testing, parenting, and 12-step meetings as part of that program, but that two weeks after completing her first program at Kiva she relapsed on methamphetamine and had used it daily for about three months thereafter. Mother also admitted she continued to visit Baby during the time she was using methamphetamine, but she would not use prior to the visit, only a few hours after.

The social worker testified that, after reviewing the entire dependency file, social worker contact logs, and reports admitted into evidence, and hearing Mother's testimony that day, it was his opinion Mother had not shown changed circumstances because of her

8

extensive drug history, several recent positive drug tests, and inability to provide a safe home for Baby. The social worker testified, based on Mother's lack of parental relationship with Baby and because Baby was a highly adoptable child, it was in Baby's best interests to order a permanent plan of adoption. In addition, he testified (based on his visitation observations) Baby had built an attachment to her current caregiver, seeking her for affection, approval, and direction, and identifies the caregiver as her "mommy." He did not observe Baby displaying the same behaviors indicating she identified Mother as her primary caregiver because Baby did not reciprocate affection toward Mother at times and did not seem distressed after separating from her. The social worker explained Baby needed permanency due to her young age and the importance for infants to be provided with safety, emotional well-being, and having their daily needs met; and cautioned a second removal from Mother's care would hinder that development. The social worker testified the likelihood of Mother maintaining sobriety was very low and leaving Baby in foster care without a permanent plan was harmful to her development and stability. Further, he stated that based on his assessment of the totality of the circumstances, adoption was in Baby's best interests.

F. The Juvenile Court's Rulings and Orders

The court denied the section 388 petition. The court noted the circumstances remained largely the same since July of 2015, when Mother completed her residential treatment program and nevertheless relapsed, and that it is in Baby's best interests for her to remain with her caregiver and in a stable situation.

9

After denying the section 388 petition, the court then turned to the section 366.26 hearing. The court terminated parental rights, and found by clear and convincing evidence Baby was likely to be adopted and that no exceptions to adoption pursuant to section 366.26 subdivision (c)(1)(B), applied. The juvenile court ordered a permanent plan of adoption for Baby, designating her current caregiver as the prospective adoptive parent and sole holder of Baby's educational rights, and ordered sibling visitation, finding that sibling interaction would not be contrary to Baby's safety and well-being. The juvenile court also noted, although there had been regular visitation by Mother, some of that visitation was during a three-month period when Mother relapsed and was not sober; and there was insufficient evidence to show that the parent-child bond exception applied. Mother filed a timely notice of appeal.

ANALYSIS

A. Mother's Challenge to the Ruling on the Section 388 Petition

Mother first asserts the court abused its discretion when it denied her section 388 petition.

*Legal Principles and Standard of Review*

Under section 388, a parent or any person having an interest in a dependent child may request the court to change, modify, or set aside a previous court order (§ 388, subd. (a)(1)), but bears the burden of proof and must show by a preponderance of the evidence that (1) there is new evidence or a change of circumstances; *and* (2) that the proposed change is in the child's best interests. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317; *In re Daijah T.* (2000) 83 Cal.App.4th 666, 672.) The petitioner must demonstrate changed

10

circumstances, not merely that there are changing circumstances. (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223 [period of "recent sobriety reflects 'changing,' not changed, circumstances"].)

When assessing a section 388 petition, "[i]t is not enough for a parent to show *just* a genuine change of circumstances under the statute. The parent must [also] show that the undoing of the prior order would be in the best interests of the child." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 529.) In making its decision on this issue, the juvenile court may not merely compare the relative strengths of the competing households (*id.* at p. 530), but instead should examine numerous factors, including (1) the seriousness of the problem that brought rise to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent to both parent and caregivers; and (3) the degree to which the problem that created the initial dependency proceeding may be easily removed or ameliorated and the degree to which it already has been removed or ameliorated. (*Id.* at p. 532.)

*Analysis*

We conclude the evidence, viewed in the light most favorable to the judgment, supports the court's decision to deny Mother's section 388 petition (*In re Stephanie M., supra,* 7 Cal.4th at p. 318), and therefore Mother cannot demonstrate the court abused its discretion.

On the first prong, Mother showed at most that a major circumstance leading to the initial dependency proceeding—her drug addiction—was in the process of changing, which a court may deem inadequate to show a real change in circumstances. (*In re Casey*

11

*D.* (1999) 70 Cal.App.4th 38, 49.) Although Mother argues on appeal that her continued progress in her substance abuse treatment reflects changed circumstances, her sobriety had only lasted for a brief period (from early Aug. 2015 to the contested § 388 hearing in Jan. 2016) and only occurred in a highly structured setting of a residential treatment program. Moreover, the court was entitled to view this recent progress with skepticism, considering the evidence she had completed the same residential treatment program but been unable to maintain the sobriety needed to parent Baby because she relapsed to using methamphetamines two weeks before the 12-month review hearing and then entered a period of daily use for three months until she resumed her latest residential treatment program. Because there was evidence Mother was a long-term drug abuser and had only recently completed the Kiva program, the court could conclude she had not shown a real change in circumstances. As the court explained in *In re Ernesto R., supra*, 230 Cal.App.4th at page 223, Mother's "recent sobriety reflects 'changing,' not changed, circumstances. [Citation.] [Mother] has a history of drug relapses, is in the early stages of recovery, and is still addressing a chronic substance abuse problem. (See [*In re Kimberly F., supra,* 56 Cal.App.4th at p. 531, fn. 9] [' It is the nature of addiction that one must be "clean" for a much longer period than 120 days to show real reform.']; *In re* [*Cliffton*] *B.* (2000) 81 Cal.App.4th 415, 423-424 . . . [200 days of sobriety not enough].) [Mother's] completion of a drug treatment program, at this late a date, though commendable, is not a substantial change of circumstances."

Mother also appears to claim she showed a change in circumstances by demonstrating she had attained the ability to safely parent Baby because she was

12

parenting Baby's younger sibling. Although Mother demonstrated that during this period she cared for her new child at her residential treatment program, she was not able to show she could manage the care of an infant outside a structured setting or be able to parent Baby on her own. Indeed, at trial, a social worker testified that based on his observations of events at the caregiver's home and at Mother's residential treatment program when both children were present, Mother was unable to manage both infants without the assistance of others. These events, in addition to suggesting Mother did not occupy a parental role in Baby's life, permitted a trier of fact to infer Mother lacked the ability to care for two very young and vulnerable children outside of brief visits in a highly structured setting.

Moreover, as to the second prong, there was ample evidence supporting the court's determination the relief requested in Mother's section 388 petition (either placement with Mother or reinstatement of reunification services up to the 24-month date) was not in Baby's best interests. Once reunification services have been terminated, as here, "the court's focus shifts from family reunification toward promoting the child's needs for permanency and stability. [Citation.] 'A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child.' " (*In re J.C.* (2014) 226 Cal.App.4th 503, 527, quoting *In re Stephanie M., supra,* 7 Cal.4th at p. 317.].) There was evidence from which the court could have concluded it was in Baby's best interests for her to remain with her current caregiver in a stable situation, and to begin the process of a permanent placement, rather than to place her in limbo for another year to await

Mother's efforts to achieve sobriety and stability. Mother appears to argue the factors outlined in *In re Kimberly F., supra,* 56 Cal.App.4th at page 532 show it was in Baby's best interests to place her with Mother or, in the alternative, to have reunification services reinstated for Mother up to the 24-month review date. Specifically, the factors articulated in *Kimberly F.* address: (1) the seriousness of the problem that led to the dependency; (2) the strength of relative bonds between the child and both the parent and caregivers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it has actually been cured. (*Ibid.*) However, the *In re J.C.* court declined to apply the *Kimberly F.* factors, holding they do not take into account the shift in focus to a child's needs for permanency *after* the reunification period has ended. (*In re J.C.*, *supra*, 226 Cal.App.4th at p. 527.)

Even assuming the *Kimberly F.* factors are relevant to the "best interests" prong, Mother's argument nevertheless fails. First, even the *Kimberly F.* court recognized it will be the "rare" case in which an appellate court would reverse a juvenile court's denial of a section 388 petition. (*In re Kimberly F., supra,* 56 Cal.App.4th at p. 522.) Moreover, *Kimberly F.* recognized section 388 provides an " 'escape mechanism' when parents complete a reformation in the short, final period after the termination of reunification services but before the actual termination of parental rights." (*Kimberly F.,* at p. 528, citing *In re Marilyn H.* (1993) 5 Cal.4th 295.) However, *Kimberly F.'s* observations occurred in the context of a dependency proceeding in which the children were removed because the family home was dirty and unsanitary (*Kimberly F.,* at p. 523), and after the reunification period ended the mother cleaned and maintained her home and engaged in a

14

parenting class and other services, and then filed a section 388 petition seeking return of her children or more reunification services. (*Kimberly F., at* pp. 524-525.) The appellate court reversed an order denying the section 388 petition, specifically noting that an important factor to be considered was the seriousness of the problem that gave rise to the dependency case. (*Kimberly F., at* p. 530.) However, the *Kimberly F.* court specifically observed that, unlike a dirty house problem, "we doubt that a parent who sexually abused his or her child could ever show a sufficient change of circumstances to warrant granting a section 388 motion. *Likewise the parent who loses custody of a child because of the consumption of illegal drugs and whose compliance with a reunification plan is incomplete during the reunification period. It is the nature of addiction that one must be 'clean' for a much longer period than 120 days to show real reform."* (*Id.* at p. 531, fn. 9, italics added.)

Here, the original issue giving rise to the proceedings was Mother's significant drug history, a more serious issue significantly less amenable to rapid remediation than the dirty home case in *Kimberly F.* Second, the strength of relative bonds between the child and both the parent and caregivers, an appropriate consideration when considering the best interests of the child, were more significant in *Kimberly F.* (56 Cal.App.4th at p. 533) than here.[5] Finally, the degree to which the problem may be easily removed or

---

[5] Based on many visits observed by the social worker between Mother and Baby, the social worker noted their relationship resembled that of a friend or close relative rather than a parent: Baby was not distressed when separating from Mother, did not look to her for approval or affection, and at times did not reciprocate Mother's affection and sought the caregiver instead. In contrast, the social worker observed Baby has identified

ameliorated, and the degree to which it has, is considered under the *Kimberly F.* factors. (*In re Kimberly F., supra,* 56 Cal.App.4th at p. 532.) Here, Mother has not shown a change of circumstance in treating her drug addiction, and thus *Kimberly F.* does not aid Mother's claim that it was an abuse of discretion to deny her section 388 petition.

At the section 388 hearing, the court considered Baby's best interests based on her needs of permanency due to her young age and developmental needs for stability, safety, and emotional well-being; and the high risk of leaving her in foster care, the least desirable placement. Ultimately, the court found Mother did not meet her burden in establishing changed circumstances or new evidence and found that it was in Baby's best interests for her to remain with her current caregiver in a stable situation. We conclude Mother has not shown the court's ruling denying her section 388 petition was an abuse of discretion.

B. Mother's Challenge to the Ruling Terminating Parental Rights

Mother asserts the trial court erred when it ordered her parental rights terminated and approved a permanent plan of adoption for Baby, arguing there was no substantial evidence that the parent-child bond exception did not apply.

*Legal Framework*

"At a section 366.26 hearing the court is charged with determining a permanent plan of care for the child. If a child is likely to be adopted, adoption is the plan preferred

---

her caregiver as her *primary* caregiver by seeming distressed when she is separated from her and looking to her when exploring unfamiliar areas or persons. A court could have concluded that, although Mother appeared bonded to Baby and maintained regular visitation throughout the case, her relationship with Baby was minimal in comparison to the caregiver's primary relationship with Baby.

16

by the Legislature.  [Citation.]  The Legislature has provided an exception to the general rule of adoption: the court should not order a permanent plan of adoption when termination of parental rights would be detrimental to the child because '[t]he parents . . . have maintained regular visitation and contact with the [child] and the [child] would benefit from continuing the relationship.' "  (*In re Casey D., supra*, 70 Cal.App.4th at p. 50, quoting former § 366.26, subd. (c)(1)(A), now § 366.26, subd. (c)(1)(B)(i).)

Once the court determines the child is likely to be adopted, the burden shifts to the parent to show termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1) (*In re Michael G.* (2012) 203 Cal.App.4th 580, 589), such as the exception for the parent-child beneficial relationship exception.  "In the context of the dependency scheme prescribed by the Legislature, we interpret the 'benefit from continuing the [parent/child] relationship' exception to mean *the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents*.  In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer.  *If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.*"  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575, italics added.)

"Interaction between natural parent and child will always confer some incidental benefit to the child.  The significant attachment from child to parent results from the

17

adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation. [Citation.] The relationship arises from day-to-day interaction, companionship and shared experiences. [Citation.] The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent." (*In re Autumn H., supra,* 27 Cal.App.4th at p. 575.)

"The factors to be considered when looking for whether a relationship is important and beneficial are: (1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive or negative effect of interaction between the parent and the child, and (4) the child's particular needs." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 467, fn. omitted.) "[F]or the [beneficial relationship] exception to apply, the emotional attachment between the child and parent must be that of parent and child rather than one of being a friendly visitor or friendly nonparent relative, such as an aunt." (*Id.* at p. 468.) Frequent and loving contact between parent and child, without the existence of a parental role in the child's life, may be insufficient to justify the selection of a permanent plan other than adoption. (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1419.)

On appeal, we employ a hybrid standard of review by applying "the substantial evidence standard of review to the factual issue of the existence of a beneficial parental relationship, and the abuse of discretion standard to the determination of whether there is a compelling reason for finding that termination would be detrimental to the child." (*In re Anthony B.* (2015) 239 Cal.App.4th 389, 395.) The reason for this hybrid standard was

18

explained in *In re Bailey J.* (2010) 189 Cal.App.4th 1308, in which the court observed its

decision whether an adoption exception applies involves two component determinations:

> "Since the proponent of the exception bears the burden of producing
> evidence of the existence of a beneficial parental or sibling
> relationship, which is a factual issue, the substantial evidence
> standard of review is the appropriate one to apply to this component
> of the juvenile court's determination. . . . [¶] The same is not true as
> to the other component of these adoption exceptions. The other
> component of both the parental relationship exception and the
> sibling relationship exception is the requirement that the juvenile
> court find that the existence of that relationship constitutes a
> '*compelling reason* for determining that termination would be
> detrimental.' (§ 366.26, subd. (c)(1)(B), italics added.) A juvenile
> court finding that the relationship is a 'compelling reason' for finding
> detriment to the child is *based* on the facts but is not primarily a
> factual issue. It is, instead, a 'quintessentially' discretionary
> decision, which calls for the juvenile court to determine the
> *importance* of the relationship in terms of the detrimental impact that
> its severance can be expected to have on the child and to weigh that
> against the benefit to the child of adoption. [Citation.] Because this
> component of the juvenile court's decision is discretionary, the abuse
> of discretion standard of review applies." (*Id*. at pp. 1314-1315.)

*Analysis*

We conclude Mother has not shown the evidence, viewed in the light most

favorable to the judgment (*In re Autumn H., supra,* 27 Cal.App.4th at pp. 575-576), is

insufficient to support the determination that there was not a significant parent-child bond

between Mother and Baby, nor has Mother shown that it was an abuse of discretion to

determine that the benefits of adoption outweighed the severance of the relationship that

had developed between Mother and Baby.

Although the evidence showed Mother regularly visited Baby and there was

affectionate contact, the evidence also supports the conclusion Mother did not occupy a

19

parental role in Baby's life. Although Mother regularly visited and engaged with Baby by playing with her and showing her affection, the social worker noted Baby looked to the caregiver for approval and addressed her as "Mommy," in contrast to her behaviors toward Mother, because Baby does not look to Mother for approval, does not embrace Mother when strangers are present, separates from Mother without distress, and runs to the caregiver rather than Mother when she is startled by a loud noise and needs comforting. The social worker testified that their relationship resembled that of a close friend or relative rather than as the birth parent, and it is the latter relationship that is contemplated for the application of the beneficial parent-child relationship. (*In re C.F.* (2011) 193 Cal.App.4th 549, 555 ["A parent must show more than frequent and loving contact or pleasant visits. [Citation.] . . . The parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive, emotional attachment between child and parent."].) We conclude substantial evidence supports the conclusion Mother had some relationship with Baby but did not have the substantial emotional attachment contemplated by the parent-child bond exception to the preference for adoption as a permanent plan.

Moreover, we cannot conclude it was an abuse of discretion to determine that the benefits of adoption outweighed any detrimental impact to Baby from severing Mother's relationship with her. The evidence showed Baby had lived with the caregiver her entire life and identified the caregiver as "mommy," and the caregiver was willing to adopt Baby and provide her with a stable and safe home. Although there may have been some detrimental impact to Baby from ending her relationship with a person who was likened

20

to a close friend or relative, we cannot conclude it was an abuse of discretion to decide that the significant value of the safety and stability of adoption outweighed any detriment.

## DISPOSITION

The orders are affirmed.


McDONALD, Acting P. J.

WE CONCUR:


O'ROURKE, J.


AARON, J.